**Robert ESCALERA, Plaintiff-Appellant,**

**v.**

**Philip COOMBE, Superintendent of Eastern Correctional Facility, Defendant-Appellee.**

No. 1216, Docket 87–2123.

United States Court of Appeals, Second Circuit.

Argued June 18, 1987.

Decided Aug. 13, 1987.

Peter J. Avenia, New York City (Gombiner & Avenia, New York City, of counsel), for plaintiff-appellant.

Leonard Joblove, Asst. Dist. Atty., Kings County, Brooklyn, N.Y. (Elizabeth Holtzman, Dist. Atty. for Kings County, Barbara D. Underwood, Asst. Dist. Atty., Kings County, Brooklyn, N.Y., of counsel), for defendant-appellee.

Before OAKES, MESKILL and PRATT, Circuit Judges.

MESKILL, Circuit Judge:

New York state prisoner Robert Escalera appeals from a judgment entered by the United States District Court for the Eastern District of New York, Glasser, J., dismissing his habeas corpus petition. The court determined that the petition presented substantial questions for appellate review and issued a certificate of probable cause in accordance with Fed.R.App.P. 22(b).

We hold that the nature and presentation of Escalera's state appellate brief was adequate to alert the New York state courts to the constitutional basis of his argument and that his claim was, therefore, exhausted. We also conclude that the state trial court's preclusion of an important alibi witness solely as a sanction for noncompliance with New York's alibi notice statute, N.Y. Crim.Proc.Law § 250.20 (McKinney 1982), absent a showing of substantial prejudice to the prosecution's case, violated Escalera's rights under the Sixth and Fourteenth Amendments. Finally, we hold that the district court erred in failing to review the sufficiency of evidentiary support for the state court's ultimate conclusion that an in-court eyewitness identification was reliable under *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and was therefore admissible.

The judgment of the district court is reversed and the case is remanded with a direction to grant the petition for a writ of habeas corpus unless the state conducts a new *Wade* hearing and grants Escalera a new trial within sixty days.

## BACKGROUND

On August 18, 1975, Jesus Cordero was walking in Fort Greene Park in Brooklyn with his friends Pasquale Nieves and Felix Torres. At approximately 6:30 p.m., the group was approached by four men who announced a holdup. One of the robbers shot Cordero in the chest, and all four robbers fled the scene.

Five days later Cordero died from his gunshot wound. By that time, witnesses Nieves and Torres had already viewed photographs of potential suspects at the police station. Tr. 176. They later testified that they both had selected Robert Escalera's photograph at this initial viewing as that of the gunman. H. 88–94, 133–37 (*Wade* hearing), Tr. 155–56 (trial).

On September 3, Detective Harold Ruger, who was assigned to the case after the initial viewing, showed Nieves and Torres, independently, an array of eight photographs. No identification was made. On September 28, Ruger added to the original array photographs of Robert Escalera and another suspect. Nieves and Torres, independently, again selected Escalera's photograph as that of the man who shot Cordero. Both witnesses later testified that Ruger's photograph of Escalera was the same one that they had picked out at the police station shortly after the shooting. H. 93, 139, Tr. 155. Escalera was immediately brought to the police station, and

Ruger brought the two witnesses, together, to see him. Nieves and Torres, together, observed Escalera, alone, through a one-way mirror and confirmed that he was the gunman. Ruger testified that both Nieves and Torres claimed to have seen the gunman some time prior to the shooting, Tr. 204, and Torres confirmed that on five, six or seven occasions Escalera had visited the frankfurter stand where Torres worked one to two years before the shooting.

The state trial court, and the district court in its habeas review, correctly noted that a one person showup of the sort conducted by Ruger, in which two witnesses jointly view the suspect, is suggestive enough to require further inquiry into the reliability of any subsequent in-court identification. *See Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."); *Wade,* 388 U.S. at 234, 87 S.Ct. at 1936 (joint viewing of lineup is fraught with dangers of suggestion). The state's brief on this appeal does not contest the state court's ruling that the showup was suggestive.

Before beginning Escalera's trial for felony murder, Justice Corso of the New York Supreme Court conducted a *Wade* hearing to determine whether the proffered in-court identification testimony of Nieves and Torres was sufficiently reliable to be admitted, despite the suggestive police station showup. Justice Corso heard testimony from the two witnesses and Ruger and concluded that the in-court identifications were based on independent recollections and were not influenced by the suggestive showup or the properly conducted photographic identification made on September 28. J.App. at 131–33. Although both Nieves and Torres testified that they had picked out Escalera's photograph at the police station, Justice Corso did not refer to that viewing. Rather, he explicitly ruled that the suggestive showup occurred only after the nonsuggestive September 28 photographic identification and that Torres had seen Escalera on several occasions prior to the shooting. *Id.* Torres' testimony, however, suggests that the initial identification may have resulted from a joint viewing of an array of photographs never submitted to the trial court and from Torres' selection of a photograph for Nieves' approval. H. 135–36, Tr. 155–56. Such an uncontrolled, joint selection, if it took place, would render the photographic identification suspect. *See Styers v. Smith,* 659 F.2d 293, 297–98 (2d Cir.1981).

Escalera's trial consumed two days of testimony. Nieves and Torres described the events in the park and identified Escalera as the gunman. The sole evidence linking Escalera to the shooting was the identification testimony of Nieves and Torres. Detective Ruger confirmed that, according to police records, the witnesses had viewed photographs at the police station and that he knew of the viewing during his investigation. Tr. 175–76. He testified that he did not know that that initial viewing resulted in an identification of Escalera because he was not present at the initial viewing. Tr. 176. Torres repeated the testimony that he gave at the *Wade* hearing regarding the initial joint viewing and selection of Escalera's photograph. Tr. 155–57.

Escalera's defense concentrated on discrediting the identification, particularly by pointing out differences between the witnesses' description of the gunman immediately after the shooting and their later in-court descriptions and identifications. Escalera testified in his own behalf and claimed that he had met his friend Samuel Gonzalez at a bus stop at 5:30 p.m. on the day of the shooting and remained with him until 7:30 p.m., except for the period from 6:00 to 6:30 p.m., during which Escalera was at home eating and showering. Tr. 228–30. Gonzalez also testified that he had been with Escalera except for the half-hour period at issue here. *Id.* at 272–74.

After the state completed its presentation and after one defense witness finished testifying, Escalera's counsel requested leave to call Escalera's brother, Peter Escalera, to testify that Escalera was at home during the half-hour period not covered by Gonzalez's testimony, 6:00 to 6:30

p.m. Peter was not on the list of alibi witnesses that Escalera's attorney had provided to the prosecutor before trial in accordance with New York's alibi notice statute, N.Y.Crim.Proc.Law § 250.20.[1] Escalera's counsel offered the court no reasonable explanation for this failure.

The prosecuting district attorney expressed surprise at the request and asked "that the witness be precluded and that I be given ample opportunity to examine [Peter] with a stenographer present." Tr. 233. Justice Corso precluded the witness based on the discretion granted to him in section 250.20(3), the lack of explanation for the late request, the likelihood that the jury would discredit testimony produced so late in the trial and the adverse impact the testimony and any continuance would have on his anticipated schedule for a pending trial. Tr. 234–35, 291–94.

During its deliberations, the jury asked "to hear the testimony regarding Torres [sic] viewing of photographs ... at the precinct," Tr. 402, noting that the initial police report "says that Torres viewed photographs at the precinct." Tr. 403. In response, unspecified testimony was read to the jury.

The jury found Escalera guilty of felony murder and he was sentenced to fifteen years to life imprisonment. The Appellate Division affirmed the conviction by memorandum decision, 61 A.D.2d 890, 402 N.Y. S.2d 700 (2d Dep't), *leave to appeal denied,* 44 N.Y.2d 953, 380 N.E.2d 342, 408 N.Y. S.2d 1032 (1978).

Escalera's petition for a writ of habeas corpus raised the two issues that he repeats here. He claims that the preclusion of his alibi witness violated his Sixth Amendment right to compulsory process and that the in-court identification was so tainted by the pre-trial procedures that suppression was required. The district court first reviewed Escalera's brief to the Appellate Division and found that its references to "the fundamental and important constitutional right of a defendant to have compulsory process" and its citation to cases employing constitutional analysis satisfied the exhaustion test articulated in *Daye v. Attorney General of the State of New York,* 696 F.2d 186, 194 (2d Cir.1982) (in banc), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984).

Moving to the merits, the district judge noted that neither we nor the United States Supreme Court has ever decided whether preclusion is a constitutionally permissible sanction for substantial failure to comply with an alibi notice statute. He concluded that there is a rebuttable presumption under the Sixth Amendment against preclusion, but that the state overcame the presumption by proving that:

(1) The surprise to the state was substantial;

(2) sanctions less severe than preclusion would have been ineffective;

(3) the proffered testimony might have been material to the outcome of the trial but was not as crucial as the alibi testimony of Gonzalez, and the

---

**1.** The alibi notice statute reads in pertinent part, as it did at the time of the trial:

> 1. At any time, not more than twenty days after arraignment, the people may serve upon the defendant or his counsel, and file a copy thereof with the court, a demand that if the defendant intends to offer a trial defense that at the time of the commission of the crime charged he was at some place or places other than the scene of the crime, and to call witnesses in support of such defense he must, within eight days of service of such demand, serve upon the people, and file a copy thereof with the court, a "notice of alibi," reciting (a) the place or places where the defendant claims to have been at the time in question, and (b) the names, the residential addresses,

the places of employment and the addresses thereof of every such alibi witness upon whom he intends to rely. For good cause shown, the court may extend the period for service of the notice.

> . . . .

> 3. If at the trial the defendant calls such an alibi witness without having served the demanded notice of alibi, or if having served such a notice he calls a witness not specified therein, the court may exclude any testimony of such witness relating to the alibi defense. The court may in its discretion receive such testimony, but before doing so, it must, upon application of the people, grant an adjournment not in excess of three days.

N.Y.Crim.Proc.Law § 250.20 (McKinney 1982).

jury was likely to discount the testimony of Escalera's brother;

(4) there was obvious potential for prejudice to the state's case, despite lack of specific discussion of prejudice by the prosecutor; and

(5) there was no good excuse for the late notice.

The district court also rejected Escalera's challenge to the eyewitness identification procedures. Applying the test of reliability outlined in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the court concluded that the in-court identification was reliable despite the suggestive showup because:

(1) both Nieves and Torres had ample opportunity to observe the gunman during the events in the park;

(2) as victims of a holdup, they had every reason to be attentive;

(3) the apparent inaccuracies in the prior descriptions of the gunman, particularly as to race, were largely due to semantic difficulties;

(4) although the level of certainty demonstrated at the highly suggestive showup proved nothing, the independent selection of Escalera's photograph from the non-suggestive arrays presented on September 3 and 28 showed a persuasive level of certainty;

(5) although the six weeks between the crime and the September 28 photographic identification would otherwise be quite important, the other *Biggers* factors militated in favor of admissibility;

(6) Torres' delay in reporting having seen Escalera prior to the shooting deprives his testimony of much weight; and

(7) "it is crucial that the showup *followed* an untainted photographic identification."

J.App. at 29.

The court dismissed Escalera's petition but issued a certificate of probable cause to appeal. 652 F.Supp. 1316.

## DISCUSSION

### A. *Exhaustion*

▮ The state has renewed its argument that Escalera's witness preclusion claim was not exhausted in the state courts because it was never phrased in Sixth Amendment terms. In *Daye,* we reaffirmed the general principle that "[a] defendant may, however, fairly present the substance of a federal constitutional claim to the state court without citing 'book and verse on the federal constitution,'" as long as "the nature or presentation of the claim [was] likely to alert the court to the claim's federal nature." 696 F.2d at 192 (quoting *Picard v. Connor,* 404 U.S. 270, 278, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)). After reviewing Escalera's brief to the New York Appellate Division, we conclude that the nature and the presentation of the claim, considered together, were sufficient to direct the court's attention to the Sixth Amendment.

### B. *Witness Preclusion Sanction*

The United States Supreme Court has not addressed the question whether preclusion is a constitutionally permissible sanction for violation of an otherwise valid alibi notice statute such as New York's section 250.20. *Wardius v. Oregon,* 412 U.S. 470, 472 n. 4, 93 S.Ct. 2208, 2211 n. 4, 37 L.Ed.2d 82 (1973) (constitutionality of sanction not reached because Oregon statute was facially invalid for failing to provide defendant with reciprocal discovery of alibi rebuttal witnesses); *Williams v. Florida,* 399 U.S. 78, 83 n. 14, 90 S.Ct. 1893, 1897 n. 14, 26 L.Ed.2d 446 (1970) (validity of sanction not reached because defendant complied with otherwise valid alibi notice statute).

The Fifth Circuit has concluded that "the compulsory process clause of the sixth amendment forbids the exclusion of otherwise admissible evidence solely as a sanction to enforce discovery rules or orders against criminal defendants." *United States v. Davis,* 639 F.2d 239, 243 (5th Cir.1981) (failure to list witnesses' names pursuant to pre-trial discovery order). The Seventh Circuit, on the other hand, has

employed a balancing test to decide whether preclusion was permitted under the Sixth Amendment to enforce a discovery rule requiring notice of defense witnesses. *United States ex rel. Enoch v. Hartigan,* 768 F.2d 161 (7th Cir.1985), *cert. denied sub nom. Lane v. United States ex rel. Enoch,* 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986). The *Enoch* Court concluded that the state's interest in applying discovery rules was not substantial enough to override the Sixth Amendment right to present "clearly material testimony." *Id.* at 163. It found that the state had failed to specify what prejudice it had suffered due to the defendant's non-compliance. *Id.* It also considered the lack of evidence of bad faith and the trial court's failure to consider less severe sanctions available to it. *Id.*

In *Ronson v. Commissioner,* 604 F.2d 176 (2d Cir.1979), we considered a trial judge's decision to preclude a defense of insanity because of a defendant's failure strictly to comply with New York's procedural rule, N.Y.Crim.Proc.Law § 250.10 (McKinney 1982 & Supp.1987) (amended 1984), requiring formal notice of intention to raise such a defense. Noting that "maximum 'truth gathering,' rather than arbitrary limitation, is the favored goal," *Ronson,* 604 F.2d at 178, we balanced the defendant's interest in presenting his "crucial" claim against the state's legitimate interest in conducting the prosecution without the substantial prejudice that might follow the last minute introduction of an insanity defense. *Id.* at 179.

We concluded in *Ronson* that the prosecution had been given informal but fair notice of the defense and that any prejudice to the prosecution's case could have been alleviated by appropriate trial management. Accordingly, we held that the decision to preclude the defense violated the defendant's Sixth Amendment rights. *Id.* at 178–79. *See also United States v. Duggan,* 743 F.2d 59, 82 n. 8 (2d Cir.1984) (constitutional right to call witnesses limited to testimony that is "relevant, material and vital to the defense;" preclusion of insanity defense held proper absent showing of materiality and vitality).

1. *State Interest in Precluding Alibi Witness Testimony*

The fundamental interests of a criminal defendant seeking to establish an alibi defense and those of the state in precluding belated introduction of an unexpected alibi witness are substantially the same as the interests balanced in *Ronson.* The respective statutory notice provisions are remarkably similar. *Compare* N.Y.Crim. Proc.Law § 250.20 (alibi witness notice) *with* § 250.10 (insanity defense notice). The features that distinguish the alibi defense from the insanity defense are the ease of fabrication of the former, *see Williams,* 399 U.S. at 81, 90 S.Ct. at 1895 ("Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate."); *People v. Rakiec,* 289 N.Y. 306, 308, 45 N.E.2d 812 (1942) (alibi notice statute affords state an opportunity to investigate possibly false alibi testimony), and the state's need for expert psychiatric examination and testimony regarding the latter, *see Ronson,* 604 F.2d at 179 (state's failure to prepare case and medical evaluation due to surprise insanity defense was a "disadvantage" that could be dealt with by granting a continuance). Therefore, the weighing of the prejudice to the prosecution's case against the defendant's need for the alibi testimony must take into account the state's reduced ability to detect and expose false testimony. *See Fendler v. Goldsmith,* 728 F.2d 1181 (9th Cir.1984) (preclusion sanction under general discovery rules unconstitutional as applied; conclusion not applicable to alibi notice rule "because of the special tendency of unexpected alibi defenses to cause unfair surprise and lengthy trial delays," *id.* at 1188 n. 12, 1190 n. 19).

Under the facts of this case we conclude that the state's interest in the truthful testimony of Peter Escalera could have been accommodated by a continuance as requested by the prosecuting district attorney to permit examination of Peter in the presence of a stenographer. The mere fact of surprise in the introduction of a witness to

fill the gap in a previously announced alibi defense is not in itself prejudicial to the prosecution's case where, as here, it can be easily remedied.

The state also has a further interest, however, in systematically and prospectively deterring fabricated alibi testimony. This interest goes beyond punishing " 'mere technical errors or omissions,' " *cf. Enoch,* 768 F.2d at 163 (quoting *Alicea v. Gagnon,* 675 F.2d 913, 924 (7th Cir.1982)), and, where backed by statute, may implicate an overriding policy designed to protect the integrity of the evidence, *cf. Davis,* 639 F.2d at 243 (alibi notice required by discovery orders of court designed only to prevent surprise and not to protect integrity of evidence because no "overriding policy" involved). It is this interest in prospective deterrence which has prompted courts to consider whether the lack of notice was the result of bad faith by the defendant, *see Enoch,* 768 F.2d at 163 (no evidence of bad faith), or his attorney, *see Ronson,* 604 F.2d at 179 (no intent by counsel to hide insanity issue), and whether there were available effective deterrent sanctions short of preclusion, *see Enoch,* 768 F.2d at 163 (less severe sanctions available but not considered by trial judge).

We need not address Escalera's personal bad faith in this respect because there was no evidence of culpability on his part in the failure to comply with the alibi notice statute.[2] Nor can we conclude that the state's interest in deterrence requires the bad faith of a defense attorney to be imputed to his client. In reaching this result, we are not unmindful that defendants may be bound by the errors of their attorneys, but we rely on the Supreme Court's proscription against "mechanistically" applying even such state rules as are designed to ensure fairness and reliability in ascertaining guilt or innocence. *See Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). We believe that "[a]bsent evidence of complicity, it is unreasonable to deprive a defend-

ant of his right to present a defense, a right guaranteed to him by the Constitution of the United States, even if his attorney intentionally failed to timely provide a list of defense witnesses to the prosecution as required by the ... rules of criminal procedure." *Chappee v. Commonwealth of Massachusetts,* 659 F.Supp. 1220, 1225 (D.Mass.1987) (applying balancing test to decide that exclusion of expert witness violated Sixth Amendment rights of defendant). Finally, the statute at issue does not provide a less severe sanction for the trial court's consideration.

### 2. *Balancing Test*

The weight afforded to the factors relevant to preclusion is left to the sound discretion of the trial judge, based on evidence in the record and supported by appropriate findings of fact. Although unreasonable demands on the court's schedule may be relevant to the availability of an effective cure for the putative prejudice to the prosecution, the state trial judge's error lay in failing to consider the remaining relevant factors. Except for its consideration of bad faith in the attorney's non-compliance, the district court's conclusions were properly addressed to the relevant factors, but, as discussed *infra,* were insufficient or unsupported by the evidence in certain vital areas.

The district court concluded that Peter's alibi testimony "might have been material to the outcome of the trial, since his testimony would have covered a time period that did not entirely overlap that to which Samuel Gonzalez testified." This was an understatement. *See Fendler,* 728 F.2d at 1189–90 & n. 14 (proffered testimony "could have been of substantial importance;" state appellate court found that testimony "might have been relevant" to defense; preclusion ruled impermissible). Peter's testimony would have filled a critical time lapse in Escalera's alibi. There simply is nothing more material to Escal-

---

**2.** Although the district judge concluded that "Escalera's apparent bad faith—or, at least, the absence of a good excuse—is evident in the very lateness of the notice," his ensuing discussion confirms that any bad faith resided in the defense attorney's apparent change in trial strategy and that the court did not hold Escalera personally responsible. *See* J.App. at 19–20.

era's guilt or innocence than evidence of his whereabouts during the thirty minutes immediately preceding the crime. The precluded testimony was "relevant, material and vital" to establishing Escalera's alibi. *See Duggan,* 743 F.2d at 82 n. 8.

Moreover, the district court found that, although the prosecutor did not specifically discuss prejudice to his case, there was "substantial surprise" and an "obvious potential for prejudice." J.App. at 19. It is quite clear that the potential for prejudice to the prosecution could have been eliminated by a brief trial continuance. *Cf. Ronson,* 604 F.2d at 179 (continuance would alleviate state's disadvantage). In fact, a continuance with an opportunity to interview Peter in the presence of a court stenographer was all that the prosecution sought.

■ Based on the court's conclusion that any prejudice to the prosecution was only potential and that the impact of preclusion on Escalera's defense would have affected the outcome depending on the jury's assessment of Peter's testimony, we conclude that the preclusion of the alibi witness violated Escalera's Sixth Amendment compulsory process right as applied to the states by the Fourteenth Amendment.

## C. *Identification Testimony*

■ To overcome the presumption that the trial court's factual findings were correct as to the reliability of the in-court identification, Escalera has submitted to the district court and to us the "part of the record of the State court proceeding in which the determination" was made. *See* 28 U.S.C. § 2254(d)(8) (1982) (exception to presumption of correctness). We conclude that the record does not fairly support the factual determinations underlying the trial court's reliability conclusion and that the district court was therefore required to conduct an evidentiary hearing into the disputed finding.

Following the preliminary *Wade* hearing, Justice Corso found that both Nieves' and Torres' in-court identifications were based on their own independent recollections, not unduly influenced by the highly suggestive showup or by the photographic identifications on September 28. J.App. at 131–33. He determined that the photographic identifications were not suggestive either in the manner in which they were conducted or in the specific content of the photographic arrays presented on September 3 and 28. *Id.*

■ Justice Corso heard both witnesses testify with particularity that they viewed photographs of suspects at the police station shortly after the shooting, J.App. at 91, 116, that police were not present in the room during the viewing, *id.* at 94, 117, and that the witnesses identified a photograph of Escalera at that time, *id.* at 94, 118. Our review of the full record of the *Wade* hearing confirms that there was no contrary testimony,[3] and that the only inconsistency between the witnesses' testimony was whether they were together or alone when they identified the photograph. Subsequent trial testimony and evidence confirms that the initial viewing of photographs in fact occurred. An uncontrolled, joint selection, if it occurred, would render the initial photographic identification suspect. *See Styers,* 659 F.2d at 297–98. Thus, the testimony clearly raised substantial questions as to the suggestiveness of the initial viewing. Moreover, there is no explanation for the apparent five week delay between the witnesses' alleged initial identification and the final September 28 identification. The lapse suggests a lack of certainty in the identification that might controvert the district court's conclusion in its *Biggers* review that there was "persuasive" certainty. *See* J.App. at 28.

The court did not investigate the implications of the initial photographic viewing

---

3. At one point in the trial Detective Ruger responded, "That's correct," to the question, "Now, your testimony that the first time that either Mr. Torres or Mr. Nieves identified a photograph of Escalera was on September 28; is that right?" Tr. 188. We note that this testimony was in the context of exploring Ruger's procedures, not directed to the initial photographic viewing. Ruger had already testified that the initial viewing had taken place, but that he had not been present and was not told of an early identification. *Id.* at 176–77.

because it concluded that it must defer under 28 U.S.C. § 2254(d) to the state court's implicit finding that the initial viewing did not occur. *See* J.App. at 31 n. 9. We disagree.

■ In matters of historical fact, a federal habeas court is bound to defer to the findings of the state court after the state court has conducted a full and fair hearing at which the material facts were adequately developed, "unless the federal court concludes that the record as a whole does not fairly support the state court's factual determination." *Matusiak v. Kelly*, 786 F.2d 536, 543 (2d Cir.) (citing 28 U.S.C. § 2254(d)(3) and (8)), *cert. dismissed*, —— U.S. ——, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986). This standard, as applied to the mixed questions of law and fact that make up the reliability test of *Biggers*, requires the district court to review subsidiary questions of historical fact to the extent disputed in the habeas petition to ensure the existence of evidentiary support in the state court record. *Dickerson v. Fogg*, 692 F.2d 238, 243 (2d Cir.1982).

The district court erred in summarily deferring to the trial court's unstated conclusion that the initial photographic viewing did not occur. Although the district court suggested that the trial court merely credited Ruger's story rather than that of the two witnesses, the record discloses that Ruger confirmed the occurrence of the initial viewing and never denied that the first identification took place. Because, as the district court decision clearly states, "it is crucial that the showup *followed* an untainted photographic identification," J.App. at 29, it was equally crucial that the court confirm the timing and rule out any possible tainting of the photographic identification. *See Richmond v. Ricketts*, 774 F.2d 957, 961–62 (9th Cir.1985) (district court must review sufficiency of state court findings of fact to determine whether presumption of correctness applies or evidentiary hearing is required); *Montes v. Jenkins*, 581 F.2d 609, 612 (7th Cir.1978) ("because the petitions ... allege facts which contradict the [state court's] description of the relevant facts, it was incumbent upon the district court to ascertain by a review of the pertinent parts of the state court record whether the factual determination was fairly supported by that record, or whether an evidentiary hearing was necessary").

In this case there is a conspicuous absence from the trial court decision of the crucial facts regarding the initial photographic viewing and identification. Our review of the record indicates most convincingly that the viewing, at least, took place and that an identification may have occurred under suggestive circumstances. We therefore hold that the trial court lacked the necessary clear and convincing evidence to support its conclusion that the in-court identification was the product of independent recollection. Under the circumstances, the district court was required to conduct an evidentiary hearing on the occurrence and effect of the initial viewing, and its failure to do so was error.

D. *Harmless Error*

Finally, assuming without deciding that the errors are subject to harmless error analysis, we consider whether the preclusion sanction or use of potentially unreliable in-court identification testimony was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We look to the " 'probable impact of the [errors] on the minds of an average jury' " to determine " 'whether there is a reasonable possibility' that the error affected the jury's verdict." *Alicea*, 675 F.2d at 925 (quoting *Allison v. Gray*, 603 F.2d 633, 634 (7th Cir.1979)).

The proffered and precluded testimony of Peter Escalera was highly relevant to Escalera's assertion that he was home during the thirty minutes prior to the shooting. Peter's testimony concerning this time period presumably would have corroborated his brother's otherwise unsupported alibi. The jury might discount the testimony of a close relative, but the possibility that Peter's testimony would affect the verdict is not unreasonable. We note with some surprise the state's citation for its contrary

contention. It cites *United States v. Smith*, 524 F.2d 1288, 1291 (D.C.Cir.1975), which states, "In view of the solid identification evidence, it seems most unlikely that the alibi testimony of relatives would have raised a doubt in the minds of the jury." In Escalera's case, the identification testimony was anything but solid.

Moreover, we cannot conclude that admission of Nieves' and Torres' identification of Escalera was harmless beyond a reasonable doubt. Their testimony was the sole evidence linking Escalera to the crime. The state simply had no case without it, and its erroneous admission would be extremely harmful. *See Dickerson*, 692 F.2d at 247 (erroneous admission of identification not harmless, even though robbery defendant also was found in non-exclusive possession of stolen goods).

## CONCLUSION

Preclusion of an important defense witness solely as a sanction for failure to comply with New York's alibi notice statute was constitutionally impermissible absent a demonstration of substantial prejudice to the prosecution's case.

As to the identification issue, the district court erred in failing to conduct an evidentiary hearing on the disputed facts surrounding the initial photographic viewing and identification. Although such error would normally entail a remand to the district court, the circumstances of this appeal favor resolution of the unresolved identification issues by the state courts if the state elects to re-try Escalera.

The judgment of the district court is reversed and the case is remanded to the district court with a direction to grant the petition for a writ of habeas corpus unless the state conducts a new *Wade* hearing and grants Escalera a new trial within sixty days.